**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Daryl Bernard McFARLEY,**
**Defendant–Appellant.**

**No. 92–5555.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1992.
Decided April 20, 1993.

See also 789 F.Supp. 705.

Mauricio Dominguez, Charlotte, NC, argued, for defendant-appellant.

Harry Thomas Church, Asst. U.S. Atty., Charlotte, NC, argued (Thomas J. Ashcraft, U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER, HALL, and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

We are here presented with the single issue of whether Charlotte (North Carolina) police officers violated Daryl Bernard McFarley's Fourth Amendment rights when they stopped him and detained his luggage to allow a dog trained to detect narcotics to sniff it. The dog's positive "alert" provided the basis on which a search warrant was issued and the luggage opened, revealing 450 grams of cocaine powder and 243 grams of crack cocaine. McFarley was indicted and convicted of possession with intent to distribute in excess of 50 grams of cocaine and was sentenced to 135 months imprisonment. He contends on appeal that the police officers had no reasonable suspicion to stop him and that the stop, because of its length, became an arrest for which the officers had no probable cause. Upon our careful consideration of the record, we affirm.

A drug interdiction unit of the Charlotte Police Department was working at the Charlotte bus terminal on August 1, 1991. Officer Faulkenberry, a member of the unit observing the passengers arriving on a bus from New York City at approximately 9:45 a.m., first noticed McFarley because he was distinctively well dressed and the first person to exit from the bus. He was carrying two shoulder bags. Another male, later identified as Mr. Stitt, was similarly dressed and exited immediately behind McFarley. Stitt remained temporarily behind while McFarley walked away "with a purpose in a hurry," glancing repeatedly at Officer Faulkenberry. When McFarley paused some 80 to 90 feet away, Stitt caught up with him and the two exchanged

words, looked over at Officer Faulkenberry, and then proceeded together to Fourth Street.

Officer Faulkenberry notified Officers Witherspoon and Holbrook about the two men, and the three officers approached McFarley and Stitt from behind as they walked along Fourth Street. As the officers reached them, Officer Faulkenberry said, "Gentlemen, may I speak with you just a minute," to which the defendant responded "Yes." Officer Faulkenberry displayed his badge, and introduced his fellow officers. As McFarley produced identification in response to Officer Faulkenberry's request, the officer observed McFarley's hand begin to shake and his shirt move from his heartbeat. Faulkenberry also observed that McFarley was breathing hard. In response to Faulkenberry's questions, McFarley explained that he and Stitt had been in New York for two days to purchase equipment for McFarley's Kung Fu studio and were returning to his home in North Charlotte. When asked where the equipment was, McFarley stated that it was too expensive and he did not buy it. When Stitt in turn was questioned, he would look to McFarley for the answer before responding. In the course of conversation McFarley stated that he was against drugs and denied having any on his person or in his bags. When Officer Faulkenberry asked permission to search McFarley's luggage, McFarley asked whether Faulkenberry had a search warrant. Officer Faulkenberry replied that he did not and was seeking McFarley's cooperation and permission. McFarley became irate and accused the officer of stopping him merely because he was a young black male who fit some type of characteristics. McFarley claimed that he had been stopped before under similar circumstances in airports. Officer Faulkenberry sought to calm McFarley, stating that he was just seeking his cooperation and was not there to upset or embarrass him. When asked again to consent to the search, McFarley responded, "No, it's the principle of the thing." Stitt did give Officer Holbrook permission to search his person and bags and that search revealed no drugs or weap-

ons. McFarley then asked Faulkenberry, "Am I free to leave?" Faulkenberry said yes, pointing out that McFarley was not under arrest and could do anything that he wanted. McFarley stated, "Well, I'm going to walk up the street." When Faulkenberry stated that he was going to walk with him, McFarley shrugged his shoulders and said, "That's fine."

As McFarley, Stitt, and the three officers walked up Fourth Street, the discussion continued with Officer Faulkenberry giving several reasons why McFarley should give the officers permission to search his bags, such as the fact that McFarley had acknowledged he was against drugs and that Stitt had already consented to a search. They continued their discussion for some 20 minutes while walking over a distance of some four blocks. During the walk, as Officer Faulkenberry slowed down, so too would McFarley. Later in the discussions McFarley stated that he had been in New York five days, contrary to an earlier statement that he had been there only two days. He also said that he was going to take a south-bound city bus home, when he had stated earlier that he lived on Mellow Drive in North Charlotte.

When the group reached the intersection of Fourth Street and Tryon Street, they were joined by Sgt. Sennett, who was also part of the drug interdiction unit. The other officers told Sgt. Sennett about their observations of McFarley and Stitt and the discussions with them. Sgt. Sennett then approached McFarley, identified himself, and asked if he could speak with McFarley for two minutes. When McFarley responded "yes," Sgt. Sennett told McFarley that he was not under arrest or in custody, but that he and the other officers suspected that there might be drugs on McFarley or in his luggage. Sgt. Sennett again asked McFarley for permission to search him and his luggage. Sgt. Sennett observed that McFarley became extremely nervous. He was breathing heavily, his hands were shaking, and he continued to look down at his bags. When he refused permission, Sgt. Sennett advised McFarley that Sennett was going to detain the luggage to subject

it to a dog sniff and if the dog alerted positively, a search warrant would be obtained. Sgt. Sennett advised McFarley, however, that McFarley was free to go about his business or to stay with his bags. If he left, the bags would be returned to him should the dog sniff prove negative. McFarley insisted on retaining the bags, stating that he wanted to speak with a lawyer. Sgt. Sennett then advised McFarley that he was free to talk with a lawyer but that the bags were being detained. After zipping the bags completely shut, McFarley surrendered them to Sgt. Sennett. This was at about 10:13 a.m., less than 30 minutes after the police officers initially observed McFarley and Stitt at the bus station.

The bags were taken directly to a location where a dog trained to detect narcotics could sniff them. The dog alerted positively to the presence of drugs in both bags, the first at 10:51 a.m. and the other at 10:54 a.m. After obtaining a search warrant on the basis of the positive alert, the bags were opened, revealing the cocaine.

McFarley pled guilty to possession with intent to distribute more then 50 grams of cocaine, reserving his right to challenge the stop on appeal. This appeal followed.

The Fourth Amendment protects the people against unreasonable searches and seizures, but not against all searches and seizures. The community has an important interest in enforcing the criminal laws and relies on its law enforcement officers to carry out that responsibility. At the same time, the individual members of the community are entitled to be free of unreasonable intrusions by law enforcement officers. The balance is struck by recognizing as reasonable that level of intrusion to individual liberty which we, as private members of the community, are willing to tolerate to have an effective law enforcement effort. Thus, it was announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that police officers do not violate the Fourth Amendment when they briefly stop a private citizen without a search warrant for the limited purpose of dispelling a reasonable suspicion that a crime has been or is being committed. The officers, however, must be able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

■ When a private citizen voluntarily consents to interrogation or a search by police officers, however, he cannot later claim, when criminal conduct is uncovered, that his Fourth Amendment rights were violated. *See Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). While consent generally has its limits, a consensual search or seizure within those limits does not implicate constitutional rights. But once consent is withdrawn or its limits exceeded, the conduct of the officials must be measured against the Fourth Amendment principles. *See Bostick,* —— U.S. at ——, 111 S.Ct. at 2386.

■ Finally, we point out that the Fourth Amendment protections and their limitations apply not only to persons, but also to their property. *See United States v. Place,* 462 U.S. 696, 700–01, 103 S.Ct. 2637, 2640–41, 77 L.Ed.2d 110 (1983). Thus that same reasonable suspicion which must justify a brief stop and search of the person must also form the basis for a detention of luggage for the purpose of conducting a dog sniff, although the dog sniff itself is not a search. *Id.* at 706–07, 103 S.Ct. at 2644–45.

With these principles stated we now turn to apply them to the facts of this case.

■ No evidence in this case casts any doubt that the initial portion of the encounter between law enforcement officers and McFarley was consensual. Officer Faulkenberry, approaching McFarley and Stitt from behind, asked, "Gentlemen, may I speak with you just a minute," to which McFarley responded affirmatively. Moreover, the dialogue from that time until the law enforcement officers insisted on detaining the luggage continued, in our judgment, to be consensual. McFarley freely

answered questions about who he was, where he had been, and where he was going. While he refused to agree to a search of his luggage without a search warrant, his refusal was honored until later when his bags were detained. During the conversations, which lasted some 20 minutes, the officers never blocked or stood in front of McFarley or Stitt. On the contrary the evidence tended to show that the movement of McFarley and the officers together was voluntary—as the officers slowed down so too did McFarley and Stitt. On several occasions McFarley and Stitt were advised that they were not under arrest and were free to go where they wished, and in fact they did move in a direction which they selected. When McFarley asked "Am I free to leave," he was told that he was free to go and do whatever he wanted. McFarley said, "Well, I'm going to walk up the street," to which the officers said, "Well, that's fine, I'm going to walk with you." McFarley said, *"That's fine."* (Emphasis added).

We believe from the totality of the evidence in the record that during this period of the encounter before McFarley's luggage was detained a reasonable person would have felt free to go and terminate the encounter. *See Bostick,* —— U.S. at ——, 111 S.Ct. at 2389. While McFarley perhaps felt that cooperation in the questioning would be most beneficial to him in deflecting suspicion, that purpose cannot form the basis for later claiming that the encounter was not consensual. Accordingly, we conclude that all discussions and actions up to 10:13 a.m. were consensual and did not implicate McFarley's Fourth Amendment rights.

 We next consider the time from 10:13 a.m. to 10:51 a.m. We agree that when Sgt. Sennett confronted McFarley at Tryon Street, announcing at 10:13 a.m. that McFarley's bags were going to be detained to have a drug dog sniff them, the voluntariness of McFarley's actions was broken and his Fourth Amendment rights were implicated to the same extent as if the detention were of McFarley's person. We must therefore determine whether the detention of the luggage at that point in the encounter was supported by a reasonable articulable suspicion. *See Place,* 462 U.S. at 706, 708, 103 S.Ct. at 2644, 2645.

We believe that the record in this case supplies an ample factual basis on which objectively reasonable and experienced police officers could have suspected that McFarley's luggage contained contraband. *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The record shows that McFarley and Stitt arrived on a bus from New York City, a source city for drugs. Both appeared "fresh" and well dressed and McFarley was wearing a gold chain, conveying an appearance that the officers found consistent with that of drug couriers. When they exited from the bus, they attempted to appear as if they did not know each other, while each canvassed the terminal area, obtaining eye contact with Officer Faulkenberry. After McFarley walked briskly away from the bus to draw out the location of potential law enforcement officials while Stitt watched from behind, the two joined to exchange words, looked at Officer Faulkenberry, and together then exited the terminal area. When confronted by the officers they appeared unusually nervous. Their hands shook, they breathed heavily, and over the course of the voluntary questioning they provided inconsistent stories about details of their travel. Stitt found it necessary to "check" with McFarley before answering questions. They first stated that they had been in New York for two days, and only when the officers pointed out that the trip was a 12–15 hour bus ride each way and two days would have been short did the two days become five. They advised the officers they went to New York for the purpose of purchasing martial arts equipment, which the officers knew to be generally available locally, and this story appeared suspicious to the officers since no equipment was in fact purchased. Finally, McFarley and Stitt indicated they were going to take a south bound bus to go home forgetting that earlier they had indicated they lived on the north end of town. The suspicions raised by this conduct in absence of other explanatory reasons reasonably justified the officers questioning to

dispel their suspicion and, when the questions did not allay the suspicion but heightened it, justified the officers briefly detaining the luggage to subject it to a dog sniff.

 McFarley nevertheless claims that the length of the stop was unreasonable, converting what may have been a lawful stop to an arrest which had to be supported by probable cause. *See Place*, 462 U.S. at 709–10, 103 S.Ct. at 2645–46; *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26. He contends that the period from 9:45 a.m. when the bus arrived until 10:51 a.m. when the drug dog first "alerted" positively, a span of over an hour, was an unreasonable length for an encounter with the thinnest of suspicions. *Cf. Place*, 462 U.S. at 710, 103 S.Ct. at 2646 (90 minutes held in the circumstances to be too long). He argues that the facts here are not unlike those in *United States v. Wilson*, 953 F.2d 116, 123 (4th Cir.1991), where we held that an officer's "prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation" amounted to a nonconsensual intrusion to which Fourth Amendment protections apply.

In *Wilson*, the defendant was initially questioned consensually in an airport after disembarking from an airplane. After he agreed to a search of his person and his luggage, which produced no contraband, Wilson prepared to leave by picking up his two coats off of a chair. The officers then asked permission to search the coats. When Wilson refused, the officers persisted in questioning him against his will. Wilson asked to go, stating he was late for an appointment. While the officers said he was free to go, they persisted in pressing their questions. As one officer conceded, "[Wilson] continued and continued to say that we were stopping him, harassing him. And his voice began getting very loud. People in the sidewalk began looking towards us. And some people had gathered. And this just persisted." 953 F.2d at 119. After continuation of the confrontation, Wilson finally yielded the coats for a search, which produced the narcotics on which he was convicted. In concluding that the search of the coats was not consensual, but was subject to Fourth Amendment protections, we stated: "Despite his best efforts, Wilson was unable to 'terminate the encounter,' 'to ignore the police presence and go about his business,' or to 'go on his way.'" *Wilson*, 953 F.2d at 122.

The factual circumstances here are distinguishable. Until the detention of the luggage, McFarley never protested the way that Wilson did. McFarley did not attempt to break off the encounter. To the contrary, he appeared to want to cooperate. He stated it was "fine" that officers walk with him and as McFarley and Officer Faulkenberry walked, McFarley coordinated his speed with that of the officer. In marked distinction, Wilson attempted to leave and often expressed the wish to have the encounter broken off. In short, the factual differences in the cases define the line between the holdings of *Wilson* and this case.

Thus, we reject McFarley's claim that the entire time from when the bus arrived (9:45 a.m.) must form the beginning time for measuring the length of the *Terry* stop. As we have already noted, until Sgt. Sennett stated that he was detaining the luggage at 10:13 a.m., McFarley's intercourse with the police officers was consensual. Rather, we must focus on the 38 minute delay after the stop, which was used to subject the luggage to a sniff, to determine whether it was longer than is necessary for diligent police officers to pursue their investigation. *See Place*, 462 U.S. at 709, 103 S.Ct. at 2645–46. We hold that in the circumstances that period was not too long. The luggage was taken directly to the location where the dog was, arriving approximately one-half hour later at 10:44 a.m. When the dog "alerted on the luggage" and showed positive for the presence of drugs, a search warrant was obtained and the luggage was opened. The dog alerted positively to the one bag at 10:51 a.m. and to the second at 10:54 a.m. At that point in time, the officers had probable cause to obtain a search warrant and thereafter, when cocaine was discovered in the bags, to arrest McFarley. No evidence has been presented to question the diligence of the

officers' efforts in subjecting the luggage to the dog's sniffs, and we hold that 38 minutes is not *per se* an unreasonably long time period in which to conduct that limited investigation.

In short, we conclude that the encounter from the time when the officers first questioned McFarley until 10:13 a.m. was consensual, that the detention of the luggage at 10:13 a.m. amounted to a *Terry*-type stop justified by a reasonable suspicion, and that in the circumstances a 38–minute detention of the luggage to subject it to a dog sniff did not elevate the stop to a full-blown arrest. Because McFarley's Fourth Amendment rights were not denied, we affirm his conviction.

AFFIRMED.

K.K. HALL, Circuit Judge, dissenting:

I respectfully dissent because I believe that the police conduct amounted to an illegal seizure of McFarley that infected the subsequent seizure of his luggage.

Certainly the encounter in the bus station began as a consensual one. The magistrate judge found that it became nonconsensual "when the defendant refused to consent to a search [of his luggage], broke off the conversation, and began walking away...." The district court placed the point of seizure further down the line, "at some point while walking up 4th St." The majority goes even further, placing the point of seizure at 10:13 a.m., when McFarley was told that his bag was being detained. I think our decision in *United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991), compels a finding that a seizure occurred well before 10:13 a.m.

The majority attempts to distinguish *Wilson* by pointing out that "McFarley never protested the way that Wilson did" and that McFarley's actions were attempts at cooperation with the police. Slip op. 8. These distinctions do not mesh with the record. McFarley denied permission to search his bags, and, in doing so, he asked the police if they had a warrant. As the majority explains, "McFarley became irate and accused the officer of stopping him merely because he was a young black male

who fit some type of characteristics," and one of the officers "sought to calm McFarley." Slip op. 3. This hardly bespeaks cooperation on McFarley's part. Nonetheless, when McFarley said he was leaving and the officer said he was going to walk with him, McFarley's response of "that's fine" is deemed sufficient to support a finding that a reasonable person would have felt free to go and terminate the encounter. Slip op. 6. I disagree.

Officer Faulkenberry did not *ask* McFarley if he would mind if the three officers continued the questioning for awhile longer; McFarley was *told* that the questioning was not yet over. As we said in *Wilson*, "[t]he principle embodied by the phrase 'free to leave' means the ability to ignore the police *and* to walk away from them." *Id.* at 122 (emphasis in original). "That's fine," considered under all the circumstances, is a slim thread indeed on which to find that McFarley consented to being accompanied through downtown Charlotte for 20 minutes by three policemen. How a "reasonable" person would go about ending a consensual encounter is not limited to the type of behavior exhibited by the suspect in *Wilson*. The only logical interpretation of McFarley's "consent" to the officer's statement is that McFarley felt (as I believe a reasonable person would feel under similar circumstances) that he had no choice. In short, he was not free to leave, and, as a consequence, he was seized.

The majority would bring the Fourth Amendment into play at the point of the seizure of the luggage (10:13 a.m.), but holds that this seizure was supported by a reasonable, articulable suspicion of wrongdoing. I disagree. I believe not only that McFarley was seized, but that the seizure was not based on reasonable suspicion that McFarley was engaged in criminal activity at that time.

The underpinnings for the "reasonable suspicion" finding are (1) McFarley arrived from New York, a "source city" for drugs; (2) he "appeared 'fresh' and well-dressed and ... was wearing a gold chain, conveying an appearance that the officers found consistent with that of drug couriers" (slip

op. 7); (3) he attempted to appear that he did not know Stitt; (4) he "canvassed" the bus terminal and made eye contact with Officer Faulkenberry; (5) he walked briskly from the bus while Stitt watched from behind, then joined Stitt and again looked at Faulkenberry; (6) when confronted by the policemen, he and Stitt were extremely nervous; (7) he said he had gone to New York for two days to shop for equipment for his Kung Fu studio; (8) he and Stitt provided inconsistent details about their travels; and (9) they said they were getting on a southbound bus after saying they lived in the north part of town. These factors are, as the magistrate judge noted in his report to the district court, "remarkably similar to those in *Wilson.*"

Factors 8 and 9 above were discovered after the point at which I would place the seizure, i.e. when McFarley began to walk away. As such, I would not consider these factors in the examination of whether there existed "reasonable suspicion" for such seizure. Taken together, the first seven factors do not rise above the level of an "inchoate and unparticularized suspicion or 'hunch'." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

Appearing fresh in the middle of the summer, after a bus trip from New York to Charlotte, strikes me as unusual, but it does not hint of criminality. Many well-dressed passengers, with and without gold chains, do not carry illegal drugs on their person. If anything, I would think that those involved in wrongdoing would attempt to blend in with the crowd. The "source city" factor stands alone and is of no probative value whatsoever. *See id.,* at 125 ("[T]he vast number of persons coming from those source cities relegates this factor to a relatively insignificant role."); *see also United States v. Sokolow,* 490 U.S. 1, 5, 109 S.Ct. 1581, 1584, 104 L.Ed.2d 1 (1989) (finding it probative that the defendant traveled in July from Honolulu to Miami, a source city, and returned after only 48 hours). Having gone to New York to buy martial arts equipment is similarly unremarkable and probably as believable a reason as most other passengers on the same bus could have proffered.

We are left with the actions of McFarley and Stitt after they exited the bus. Officer Faulkenberry testified that McFarley "began to stare back at him," but again, this strikes me as an eminently reasonable response to Faulkenberry's apparently quite obvious surveillance of McFarley. If a stranger stares at you, do you stare back? None of the officers were in uniform.

If McFarley was extremely nervous when he was first stopped, and the undisputed testimony is that he was, this condition was apparently short-lived. McFarley soon became irate and accusative. The entire encounter (from initial encounter through seizure of the luggage) lasted some 25 minutes. I submit that nervousness is a quite natural response to being stopped and questioned on a busy public street by three out-of-uniform policemen who have just approached from behind.

McFarley was illegally seized, and any additional grounds for suspicion of ongoing criminal activity garnered during this seizure cannot be used to justify the seizure of the luggage. I would vacate the conviction and remand with instructions to grant the motion to suppress.