25 F.3d 1042
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Shawn GRAVES, a/k/a Kevin Myers, Defendant-Appellant.
 No. 92-5492.
 United States Court of Appeals, Fourth Circuit.
 Argued April 14, 1994.
Decided May 31, 1994.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Sr., District Judge. (CR-91-268-6)
 Danny Thomas Ferguson, Winston-Salem, NC, for appellant.
 Sandra Jane Hairston, Asst. U.S. Atty., Greensboro, NC, for appellee. North Carolina, for appellant; On brief, Benjamin H. White, Jr., U.S. Atty., Greensboro, NC, for appellee.
 M.D.N.C.
 AFFIREMD IN PRAT, REVERSED IN PART, AND REMANDED.
 Before HALL and MICHAEL, Circuit Judges, and GODBOLD, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Shawn Graves appeals his convictions for possession with intent to distribute cocaine hydrochloride and possession with intent to distribute crack cocaine. We affirm the first and reverse the latter conviction, and we remand for resentencing.
 
 I.
 
 2
 On December 6, 1991, Shawn Graves arrived at the airport in Greensboro, North Carolina, on a regular flight from LaGuardia Airport in New York. Graves is black, nineteen years old, and was carrying a bag. As he entered the terminal, he made eye contact with two other persons, who then accompanied him, without speaking, as he walked through the airport. Kenneth Kennedy and William Goodwin, two local detectives who keep a close eye on the flight from LaGuardia as a part of "routine" drug interdiction, observed Graves' actions. Outside the terminal, the detectives approached Graves and asked to talk to him. After some initial questioning,[1] during which Graves grew nervous and the detectives' suspicions were not quelled, the detectives explained their drug interdiction efforts and asked Graves if he had brought drugs from New York. Graves said no.
 
 
 3
 Detective Kennedy then asked Graves if he could search the bag. Graves asked if he had to permit the search. Kennedy conceded that he did not, so Graves said, "Well then, no." Kennedy then stated that he "would like to detain" the bag so that it could be sniffed by a dog.
 
 
 4
 Graves relented and permitted the bag to be searched. No drugs were found.
 
 
 5
 Kennedy kept up the pressure. He told Graves that, based on his actions during the questioning, he thought Graves was carrying drugs. He asked Graves if he would consent to a search of his person. Graves again said no, and the detectives again would not take no for an answer. Kennedy asked Graves to come to "the office" to discuss the matter. Graves agreed, took a couple of steps, and then pushed Goodwin out of the way and began running. He threw a package into the air; Goodwin caught it. This package contained 192.8 grams of cocaine hydrochloride. Graves eluded Goodwin, but not until Goodwin saw him with his hand in his pocket and later saw him crouch beside a car on the fourth level of the airport parking garage. Graves was apprehended by Kennedy on the third level of the garage about fifteen minutes later; he was crouched behind a large car when found. That night, over eleven hours after the chase, an airport security officer found a package containing 58 grams of crack cocaine on the fourth level of the garage.
 
 
 6
 Graves was charged by a federal grand jury with possession with intent to deliver the drug in each of the two packages.
 
 
 7
 A jury trial was held. Though he made no pretrial motion to suppress any physical evidence on Fourth Amendment grounds,[2] Graves did object at one point during Kennedy's testimony on that basis. The district court found that the evidence to that point had not shown that he was not free to leave, and overruled the objection. Graves was convicted on both counts and was sentenced to ten years in prison.
 
 
 8
 Graves appeals.
 
 II.
 A.
 
 9
 Graves challenges the sufficiency of the evidence to support his convictions. We must affirm the convictions if, considering the evidence in the light most favorable to the government, we conclude that a rational jury could have found that the elements of the crimes were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making this judgment, we must bear in mind that the beyond a reasonable doubt standard, itself mandated by the Due Process Clause,[3] requires the factfinder to attain a "subjective state of near certitude" that the defendant is guilty. Id. at 315. Evidence that can produce only a subjective state of suspicion, even strong suspicion, in a rational mind falls short of the due process minimum. See, e.g., United States v. Fountain, 993 F.2d 1136, 1139 (4th Cir.1993).
 
 B.
 
 10
 As to the cocaine hydrochloride count, Graves' argument is very weak. Goodwin saw Graves throw the cocaine into the air, Goodwin caught it, its chemical composition and the chain of its custody were established, and it was admitted at trial. A rational jury could achieve a "subjective state of near certitude" of Graves' guilt from this evidence.
 
 C.
 
 11
 Graves' challenge to his crack possession conviction has considerably more merit. The package of crack was not found until eleven hours later. Graves quite naturally argues that it could have come from anywhere, and, considering that authorities believe that drugs come into the Greensboro airport regularly enough to conduct regular, "routine" interdiction, we think that there is a good deal of force to his argument.
 
 
 12
 Three bits of evidence must carry the whole load for the government--Goodwin saw Graves with his hand in his pocket as he fled, the package was found in the same general area where Goodwin saw Graves crouch down, and the wrapping on the package was somewhat similar to the packaging of the cocaine hydrochloride. Is that enough for a rational jury to find beyond a reasonable doubt that the crack belonged to Graves?
 
 
 13
 Though the issue is close, we think not. No one observed a bulge or any other indication that Graves had something in his pocket. His crouching behind a car is not particularly notable, inasmuch as he was attempting to avoid detection by his pursuers; indeed, he was found in that very posture.
 
 
 14
 Furthermore, the government overstates the "similarity" of the two packages of drugs. First of all, the form of cocaine in each was different. Moreover, the cocaine hydrochloride was in a baggie; the crack in a paper towel. The sole feature the two had in common was that they were both wrapped in plain cellophane. Detective Kennedy testified that he sees drugs wrapped in cellophane "quite a bit,"[4] though Goodwin felt that such wrapping was "unusual." In any event, cellophane is available to every American with a dollar or two, and that neighbors have leftovers wrapped in cellophane in their respective refrigerators does not prove beyond a reasonable doubt that they dined together.[5]
 
 
 15
 In short, though the government's evidence certainly rouses suspicion, it cannot support a rational finding of guilt beyond a reasonable doubt. Graves' conviction for possession of crack cocaine with intent to distribute must be reversed.[6]
 
 III.
 
 16
 Graves argues that he was illegally seized during the initial questioning by the detectives. However, he made no motion to suppress the cocaine hydrochloride; he simply objected as Kennedy began to testify about the incident. The district court overruled the objection because it had not heard anything to that point that would establish that Graves had not been free to leave. The objection was never renewed.
 
 
 17
 On the evidence before it at the time the objection was made,[7] the district court's finding that Graves was not "seized" is not clearly erroneous. Our case law on stops at public transportation terminals establishes that a consensual police-citizen encounter does not become a seizure unless the police ignore the citizen's unequivocal attempt to terminate the encounter. United States v. McFarley, 991 F.2d 1188 (4th Cir.), cert. denied, 114 S.Ct. 393 (1993); United States v. Wilson, 953 F.2d 116 (4th Cir.1991).
 
 
 18
 McFarley illustrates the point, perhaps at or near its extreme. In McFarley, the defendant and a friend arrived by bus in Charlotte. They "looked fresh" and were wearing gold chains. McFarley stared at one of the officers, who were in plain clothes. McFarley and his companion started walking up the street outside the terminal. Several officers approached them and asked to search their bags. McFarley's friend consented (nothing was found), but McFarley asked if the officers had a warrant. When the officers said no, McFarley became angry, accusing the officers of harassing him just because he was black, and he refused to consent to the search because of "the principle of the thing." McFarley asked if he was free to leave. The officers said yes, so McFarley said, "I'm going to walk up the street." One of the officers decided that he would walk with McFarley, to which McFarley stated, "That's fine." After accompanying McFarley for twenty minutes, the officers finally convinced him to permit his luggage to be sniffed by a dog. The dog alerted; the bags contained cocaine. We affirmed the denial of the defendant's motion to sup press, because McFarley had never unequivocally tried to end the encounter. Thus, we concluded that the entire twenty-minute stroll up the street was consensual.
 
 
 19
 Here, there is no doubt that Graves' initial encounter with the detectives was "consensual" under our cases. Moreover, though Graves exercised his rights to refuse to consent to particular searches, he never made an attempt to exercise his right to leave.
 
 
 20
 In sum, the conviction on Count One of the indictment is affirmed, the conviction on Count Two of the indictment is reversed, and the case is remanded for resentencing.
 
 
 21
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 
 [1]
 The officers asked to see Graves' ticket, which he said he had left on the plane. He claimed to be a student at North Carolina A & T. The officers asked him what his Greensboro address was. After "quite a bit of hesitation," he responded "1025 North Church Street." There is no such address, though the officers apparently did not know that at the time
 
 
 [2]
 He did move in limine to exclude the package of crack cocaine on the ground that its connection to him was too attenuated for it to be relevant. The district court denied this motion
 
 
 [3]
 In re Winship, 397 U.S. 358 (1970)
 
 
 [4]
 The frequency with which drugs are so packaged may be explained by another bit of Kennedy's testimony--he has never been able to obtain usable fingerprints from cellophane
 
 
 [5]
 The airport police officer who found the package of crack actually discarded the cellophane into the scattered garbage in which he found the package, which illustrates, we think, how unremarkable the wrapping is. Detective Kennedy later retrieved the cellophane
 
 
 [6]
 Our reversal of this conviction moots Graves' challenge to the district court's denial of his motion in limine to exclude the package of crack
 
 
 [7]
 Kennedy had recounted the encounter up to his statement that he "would like to detain" the bag for a "drug dog" to sniff it, and Graves' response that Kennedynnn could "go ahead and search it."