54 F.3d 774
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kolawole ADEBANJO, Defendant-Appellant.
 No. 93-5550.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 9, 1995.
Decided: May 19, 1995.
 
 ARGUED: Randolph O'Neil Gregory, Sr., Baltimore, MD, for Appellant. Richard Charles Kay, Assistant United States Attorney, Baltimore, MD, for Appellee. ON BRIEF: Lynne A. Battaglia, United States Attorney, Marshal D. Morgan, Third Year Law Student, Baltimore, MD, for Appellee.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Kolawole Adebanjo (Adebanjo) was indicted for possession with intent to distribute 100 grams or more of a controlled substance containing heroin. See 21 U.S.C.A. Sec. 841(a)(1) (West 1972). Adebanjo moved unsuccessfully to suppress introduction of the drugs and subsequently pled guilty to the indictment, but reserved his right to appeal the suppression ruling. Adebanjo now appeals, contending that the district court erred in admitting the drugs seized in connection with his arrest. We affirm.
 
 I.
 
 2
 On February 23, 1993, Maryland State Trooper Quinones (Quinones) was conducting plain-clothes narcotics interdiction at the train station in New Carrollton, Maryland. Shortly after 8:30 p.m., Quinones observed Adebanjo exit a southbound train from New York City, a known source city for drug trafficking. Adebanjo was neatly dressed, carried no luggage, but was holding a white paper bag bearing the emblem of a fast food restaurant.
 
 
 3
 As Adebanjo walked past Quinones, the men made eye contact, and Adebanjo quickly averted his gaze. After walking past Quinones, Adebanjo turned around to observe Quinones; the men again made eye contact, and again, Adebanjo quickly averted his stare. Adebanjo then boarded the escalator, walked briskly down it, and as he was descending, he made eye contact once more with Quinones, and again he suddenly turned from Quinones' view. Quinones followed Adebanjo to the lower platform, observed him make a one-minute telephone call, followed him back to the upper platform, and again made eye contact, which was quickly broken off by Adebanjo.
 
 
 4
 As Adebanjo reached the top of the escalator, he stopped walking and turned to face Quinones, who identified himself as a law enforcement officer and displayed his badge and identification card. At this point, Adebanjo's eyes widened, and he began to scan the platform; indeed, Quinones testified that Adebanjo was "nervous" and "perspiring." (J.A. 27). Quinones asked Adebanjo if he could talk to him, to which Adebanjo responded "all right." Id. at 21. According to Quinones, Adebanjo stated that he had just exited the train from Philadelphia, where he had met his wife for the day. On being asked for his train ticket, Adebanjo stated that he left it on the train. When Quinones asked where Adebanjo lived, Adebanjo stated that he lived in Philadelphia. Quinones asked whether Adebanjo had any identification, and he produced a Maryland driver's license with a Maryland address, and, contrary to his instant representation, stated that he lived in Maryland. When asked to explain his inconsistent answers, Adebanjo stated that he meant to say "Maryland" instead of "Philadelphia. "
 
 
 5
 Adebanjo asked Quinones "what was going on." Id. at 23. Quinones responded that he was working on the drug interdiction team at the train station in an effort to identify drug couriers entering Maryland. Adebanjo stated that he was not engaged in drug trafficking. Quinones asked if he could search Adebanjo's white paper bag, and Adebanjo agreed. Quinones did not touch the bag or take custody of it; he merely looked inside while Adebanjo held it open and observed some hamburgers, a child's shoe box, and a rolled up "brown paper bag package." Id. Based on his experience, training, and prior arrests he had made, Quinones concluded that the brown paper bag was rolled in a way consistent with the manner in which drugs are packaged. Quinones asked whether he could search the brown paper bag, but Adebanjo declined, responding that it was just food and that he already let Quinones look in the white paper bag.
 
 
 6
 Denied from searching the brown paper bag, Quinones asked if Adebanjo would consent to having a trained dog sniff the bag for controlled substances, and he agreed, saying "let's go." Id. at 25. Adebanjo agreed to accompany Quinones to the lower platform so that Quinones could call for a dog. Quinones walked in front of Adebanjo, and every time Quinones abated his pace in order to permit Adebanjo to remain in tandem with him, Adebanjo likewise lessened his pace. As they descended the stairs, Adebanjo reached into his jacket with his right hand, and Quinones, for safety purposes, told him to remove his hand from his jacket. Adebanjo complied and then told Quinones to get the dog, and he would wait for him. At this point, Adebanjo turned from Quinones and ascended the stairs. Quinones followed Adebanjo and asked him where he was going. Despite the fact that he walked by two cabs, Adebanjo responded that he was calling a taxi and going home.
 
 
 7
 Quinones informed Adebanjo that he was going to detain the bag to get a dog to sniff it and possibly apply for a search warrant if the dog indicated that the bag contained controlled substances. Quinones told Adebanjo that he was free to leave and that Quinones would contact him later about retrieving the contents of the bag. Adebanjo, however, refused to surrender the bag, and Quinones again repeated that he planned to have a dog sniff the bag but that Adebanjo was free to leave. Quinones reached for the bag, but Adebanjo pulled it away and began to run. Quinones caught up with Adebanjo and reiterated that Adebanjo was still free to leave and not under arrest, but he was going to retain the bag. A struggle ensued over the bag, it ripped open, and a large freezer bag filled with several packages wrapped with electrical tape fell out of the shoe box. Quinones testified that his experience in law enforcement led him to conclude that these packages contained controlled substances because narcotics were often wrapped in such a fashion for human ingestion so that they could be transported easily. At this point, Quinones placed Adebanjo under arrest. The record reveals that the small packages wrapped with electrical tape contained heroin and that the brown paper bag also contained small packages of heroin wrapped with electrical tape.
 
 
 8
 Adebanjo was charged in a one-count indictment with possession to distribute 100 grams or more of a controlled substance containing heroin. 21 U.S.C.A. Sec. 841(a)(1) (West 1972). Adebanjo moved to suppress the drugs recovered after his struggle with Quinones. The district court denied the motion, concluding that the encounter with Quinones was consensual until Adebanjo withdrew his consent to have the dog sniff the bag and walked away. The district court assumed for purposes of the suppression motion that the encounter transformed into a seizure when Quinones followed Adebanjo back up the stairs and continued to question him. Alternatively, the district court opined that a seizure occurred when Quinones attempted to take the bag from Adebanjo. The district court then concluded that regardless of which alternative time the encounter became a seizure, at both times Quinones had reasonable, articulable suspicion to seize Adebanjo. Accordingly, Adebanjo's motion to suppress the introduction of the drugs was denied.
 
 
 9
 On appeal, Adebanjo contends that the district court erred in its determination as to when the encounter became a seizure. According to Adebanjo, he was seized when Quinones asked to search the bag. Alternatively, he asserts that he was seized when Quinones told him to remove his hand from his jacket. Adebanjo also asserts that at either time the seizure was not based upon a reasonable, articulable suspicion.
 
 II.
 
 10
 The threshold issue to resolve is when the encounter between Quinones and Adebanjo ceased to be consensual and became a seizure. Consensual encounters do not implicate the Fourth Amendment, but seizures do. See Florida v. Bostick, 501 U.S. 429, 434 (1991). The Supreme Court has consistently held, however, "that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Id. Provided that "a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Id. (quoting California v. Hodari, 499 U.S. 621, 625 (1991)). Accordingly, if a person is free to leave, then he is not seized. See United States v. Mendenhall, 446 U.S. 544, 554 (1980). An encounter, therefore, will not implicate Fourth Amendment concerns until and unless it ceases to be consensual. As the Court explained in Terry v. Ohio, 392 U.S. 1 (1968):
 
 
 11
 Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.
 
 
 12
 Id. at 19 n. 16.
 
 
 13
 At the suppression hearing, the district court opined that United States v. Wilson, 953 F.2d 116 (4th Cir.1991), was both factually and legally similar to the present appeal and militated strongly in favor of granting Adebanjo's motion to suppress. Ultimately, however, the district court denied the motion to suppress, distinguishing this case from Wilson because Quinones testified to the special significance he attributed to the manner in which the brown bag was rolled. We find, however, that disposition of this appeal is controlled by United States v. McFarley, 991 F.2d 1188 (4th Cir.), cert. denied, 114 S.Ct. 393 (1993), not Wilson.
 
 
 14
 In McFarley, drug interdiction officers working at a bus terminal in Charlotte, North Carolina, observed two well-dressed men, McFarley and Stitt, carrying only shoulder bags, exit a bus from New York City, look repeatedly at the officers, seemingly depart separately, but then meet later, again observe the officers, and quickly exit the terminal. Id. at 1189-90. The officers asked McFarley and Stitt if they could speak with them, and McFarley agreed. Id. at 1190. The officers identified themselves and noted that McFarley became nervous, his hand shook, and his breathing became labored. Id. When the officers asked if they could search the shoulder bags, McFarley became irate and refused, but Stitt eventually agreed to a search of his bags. Id. McFarley asked whether he was free to leave, and the officers replied yes, stating that he was not under arrest. Id. McFarley then announced he was going to walk up the street, and the officers said they were going to follow, to which McFarley responded, "That's fine." Id. The officers stated that McFarley should consent to a search and noted that he told inconsistent stories in connection with arriving from New York City. Eventually, another officer appeared, repeated that McFarley was not under arrest or in custody, but again McFarley denied permission to search the bags. Id. The officer then told McFarley that he was going to detain the bags, let a trained dog sniff them, and if the dog indicated that there were drugs in the bags, a search warrant would be obtained. Id. at 1190-91. McFarley was again informed that he was free to leave or stay with the bags. Subsequently, McFarley surrendered the bags, which contained cocaine and cocaine base. Id. at 1191.
 
 
 15
 On appeal, we sustained McFarley's conviction. We explained that McFarley's encounter with the officers was consensual until he was informed that his bags would be "detained to have a drug dog sniff them" because until this time, he was free to terminate the encounter. Id. at 1192. We were compelled to this conclusion because until McFarley's bags were detained, he, as Adebanjo in the instant appeal, was repeatedly informed that he was not under arrest and was free to leave. Id. As distinguished from Wilson, Adebanjo was not subject to "prolonged and persistent questioning after [he] conveyed an unequivocal willingness to engage in further conversation," Wilson, 953 F.2d at 123, nor "[d]espite his best efforts, [was Adebanjo] unable to terminate the encounter, to ignore the police presence and go about his business, or to go on his way," id. at 122 (internal quotation marks omitted). We noted that until the bags were detained, McFarley never protested in the same manner as Wilson. Unlike Wilson, McFarley did not attempt to terminate the encounter. We concluded that McFarley's conduct in continuing to answer questions and failing to protest distinguished the case from Wilson. See McFarley, 991 F.2d at 1193.
 
 
 16
 Applying these principles, we conclude that Adebanjo was not seized when Quinones looked in the white paper bag or when he told Adebanjo to remove his hand from his jacket. At both of these times, Adebanjo was free to leave; his movement was not restricted, nor was his liberty restrained, as evidenced by the fact that he changed his mind about going with Quinones to wait for the dog. See McFarley, 991 F.2d at 1192 (noting that because the defendant's movement was not restrained but he was able to proceed in any "direction which [he] selected," the stop was consensual); see also Bostick, 501 U.S. at 435-36 (holding that a person on a bus is not "seized," even though he is confined to the bus, because the conduct of law enforcement officers was not responsible for the confinement). At neither of these times did Quinones seize Adebanjo. Rather, Adebanjo was seized when Quinones announced that the bag was being detained. Adebanjo consistently cooperated with Quinones until he turned and walked back up the stairs. Adebanjo said "all right" when Quinones asked to question him, agreed to let Quinones look in the white paper bag, and replied "let's go" when asked if he would mind having a dog sniff the bag. In short, Adebanjo did everything that was asked of him; his conduct was consensual until he walked back up the stairs. Like McFarley and unlike Wilson, Adebanjo did not consistently protest the law enforcement officer's questions. Accordingly, we conclude that until Quinones announced that the bag was being detained, the encounter was consensual.
 
 III.
 
 17
 The issue now becomes whether there was reasonable, articulable suspicion to seize Adebanjo at the point the encounter ceased to be consensual. See McFarley, 991 F.2d at 1192. Once an encounter ceases to be consensual, reasonable articulable suspicion that an individual is engaged in criminal activity is required before law enforcement officers may continue to question or to detain him. See United States v. Sokolow, 490 U.S. 1, 7 (1989). To satisfy the Fourth Amendment, law enforcement officers must have more than an "inchoate and unparticularized suspicion or 'hunch,' " that criminal activity is afoot, Terry, 392 U.S. at 27, because the Fourth Amendment demands "some minimal level of objective justification to validate the detention or seizure," INS v. Delgado, 466 U.S. 210, 217 (1984). The quantum of reasonable, articulable suspicion required, however, is less than that required for probable cause. See Sokolow, 490 U.S. at 7. The concept of reasonable, articulable suspicion is flexible and not given to hard-and-fast rules. See id. at 8. In determining whether there is reasonable, articulable suspicion to detain or seize an individual, the court must consider "the totality of the circumstances--the whole picture must be taken into account." United States v. Cortez, 449 U.S. 411, 417 (1981). In making this assessment, "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id. at 418. The Supreme Court has recognized that even when law enforcement has no basis for suspecting an individual, officers may still question him, see Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984) (per curiam ), ask to inspect identification, see Delgado, 466 U.S. at 216, and request to search luggage, see Florida v. Royer, 460 U.S. 491, 501 (1983) (plurality opinion).
 
 
 18
 The district court relied on the following facts to determine that Quinones had reasonable, articulable suspicion to seize Adebanjo at the time, albeit at a different time than we conclude, the encounter ceased to be consensual. One, Adebanjo displayed characteristics of a drug courier: he arrived well-dressed from a source city and carried no luggage. While this factor alone is insufficient to satisfy reason able, articulable suspicion, see Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curiam ), appearance and arrival from a source city are material factors in determining the existence of reasonable, articulable suspicion, see McFarley, 991 F.2d at 1192 (" 'fresh' " and "welldressed" men arriving from New York City, a known source city, aid in creating reasonable, articulable suspicion). Two, Adebanjo was nervous, quickly averted eye contact with Quinones on several occasions, scanned the platform, and his eyes widened when Quinones revealed his identity and mission. See id. (nervousness in speaking to law enforcement contributes to establishing reasonable, articulable suspicion). Three, Adebanjo misrepresented the location of his residence, initially representing that he lived in Philadelphia, but later stating that he lived in Maryland. Making misrepresentations to law enforcement officers is yet another factor tending to establish reasonable, articulable suspicion. See id.; see also United States v. Berry, 670 F.2d 583, 603-04 (5th Cir. Unit B 1982) (en banc ) (misrepresenting information to law enforcement officers is a proper consideration in analyzing whether reasonable, articulable suspicion exists). Four, based on his experience, Quinones testified that the manner in which the brown bag was rolled was consistent with how bags containing drugs were rolled. While the district court was somewhat skeptical that the manner in which a bag was rolled tended to indicate criminal activity, the court noted that it was obligated to view the bag as Quinones saw it, as a law enforcement officer with some experience in drug interdiction, which is consistent with the admonition in Cortez that the evidence must be viewed through the practical lens of experienced law enforcement. See United States v. Aguiar, 825 F.2d 39, 41 (4th Cir.) (explaining that a bulge strapped to the defendant's ankle had special significance to a narcotics law enforcement agent and that this fact, among others, aided in establishing probable cause), cert. denied, 484 U.S. 987 (1987). These four facts are "supported by the evidentiary record" and are not clearly erroneous. United States v. Gooding, 695 F.2d 78, 82 (4th Cir.1982). All these facts were known to Quinones before the encounter ceased to be consensual, and thus Quinones had reasonable, articulable suspicion to seize Adebanjo. The totality of the circumstances created reasonable, articulable suspicion that criminal activity was afoot. Accordingly, Adebanjo's motion to suppress was properly denied by the district court.
 
 IV.
 
 19
 There is no merit to Adebanjo's assertion that he was seized when Quinones asked to search or looked in the bag--at this point, Quinones had not even touched the bag, let alone taken custody of it. Nor can we accept Adebanjo's alternative argument that he was seized when Quinones told him to remove his hand from his jacket. We hold that the encounter ceased to be consensual, and the seizure of Adebanjo occurred when Quinones stated his intention to detain the bag over Adebanjo's objections and a struggle ensued. At this point, there was reasonable, articulable suspicion to justify the seizure of Adebanjo. Accordingly, the judgment is affirmed.
 
 AFFIRMED
 MURNAGHAN, Circuit Judge, dissenting:
 
 20
 I do not take issue with the majority's conclusion that Adebanjo was first seized for Fourth Amendment purposes when Officer Quinones signified an intention to retain the bag that Adebanjo was carrying. Up until that point, the police officer had secured and exercised his right to perform a consensual search of Adebanjo and his belongings. However, because I believe that at the time Adebanjo withdrew consent, no reasonable suspicion existed to justify the seizure of his belongings, I respectfully dissent.
 
 
 21
 Quinones' exercise of his right to question Adebanjo and search his bag did not reveal contraband. The bag contained food, a shoebox, and a rolled up brown paper bag. The officer noticed a smell of food coming from the bag. Quinones did not at that point attempt to seize the brown paper bag. Instead, he decided to call a dog that would sniff the bag to determine the existence of drugs. After Quinones and Adebanjo set off to contact the police dog, Adebanjo decided to leave the train station. The police officer followed Adebanjo and informed him that he was free to leave, but that his bag would have to be left behind to permit examination by the police dog. At that point, Adebanjo clearly revoked any consent he had previously given to search his belongings, and exercised his right to leave and to take the bag with him. During an ensuing struggle between Adebanjo and the police officer, Adebanjo's bag fell to the ground, revealing drugs.
 
 
 22
 The majority bases its finding of reasonable suspicion to justify a search on four factors relied upon by the district court. First, they point to the fact that Adebanjo exhibited certain characteristics of a drug courier, because he arrived from a "source city" wearing black slacks, a white dress shirt, dress shoes, and a brown leather jacket, and had no luggage. This alone, as the majority concedes, clearly did not constitute reasonable suspicion to suspect Adebanjo of drug activity. Quinones stated that when he first saw Adebanjo exit the train, he had no idea whether Adebanjo had come from New York, and admitted that virtually every major city on the train route between New York and Baltimore, except for Dover, Delaware, would be considered a "source city." Thus most, if not all, of the passengers getting off of the train would have possessed a characteristic of a drug courier. As we have stated, "[a] suspect's arrival from a 'source city' is still noted by many courts as a factor lending support for a 'reasonable suspicion' finding, but the vast number of persons coming from those 'source cities' relegates this factor to a relatively insignificant role." United States v. Wilson, 953 F.2d 116, 125 (4th Cir.1991).
 
 
 23
 Second, Quinones stated that Adebanjo averted his gaze when Quinones looked at him, and that his eyes became wide and he scanned the platform when Quinones told him that he was searching for drugs. Quinones testified that drug couriers often scan platforms when they detrain; however, he also acknowledged that all people who exit trains scan the platform to see which direction they should be walking. The fact that Adebanjo looked around in an area in which people are constantly looking for signs to direct them did not, along with Adebanjo's arrival from a "source city," create reasonable suspicion. In addition, Adebanjo's look of surprise when Quinones told him that he was a police officer searching for drugs is exactly the look that one would expect from an innocent person who is singled out by the police to be questioned in a train station.
 
 
 24
 Third, Adebanjo initially misrepresented his place of residence. However, when Quinones asked Adebanjo for his driver's license, Adebanjo provided it to him without hesitation. Officer Quinones did not explain at the suppression hearing why Adebanjo's misrepresentation of his place of residence as Philadelphia would have signified illicit drug activity to him. Adebanjo made no attempt to conceal the fact that his actual place of residence was in Maryland, and explained that he had misspoken when he stated that he resided in Philadelphia. The mere fact that Adebanjo misrepresented his place of residence, in light of the fact that he corrected the mistake within less than one minute, does not add anything to the reasonable suspicion calculus. See Wilson, 953 F.2d at 118, 125 (no finding of reasonable suspicion where defendant stated that he had arrived from Boston when in fact, he had arrived on a shuttle from New York).
 
 
 25
 Finally, the white bag that Adebanjo was carrying when he disembarked from the train contained within it a smaller brown bag that was rolled up. Quinones testified that "[c]ontrolled dangerous substances are often placed in the bottom of the bag and they are rolled up." In other words, it was not the type of bag, but rather the fact that it was rolled up, that made Quinones suspicious. While it is true that we must take into account the significance that is attributed by law enforcement officers to certain evidence, see United States v. Cortez, 449 U.S. 411, 418 (1981), "any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle." United States v. Gooding, 695 F.2d 78, 82 (4th Cir.1982) (citing Brown v. Texas, 443 U.S. 47, 52 (1979)). There was nothing unusual in the presence of a rolled brown bag within the white bag that Adebanjo was carrying, especially considering the officer's observation of food within the white bag. Moreover, Adebanjo made no effort whatsoever to hide the rolled up bag. See Wilson, 953 F.2d at 125 (the existence of a bulge in an unremarkable location which the defendant does not attempt to hide does not support a finding of reasonable suspicion).
 
 
 26
 Looking at the situation through Quinones' eyes, but keeping in mind that we are the final arbiters of reasonable suspicion, Quinones was not justified in seizing Adebanjo's bag. The Fourth Amendment requires that an officer have a reasonable suspicion of unlawful activity before he or she institutes a seizure in order for the seizure to be constitutional. See United States v. Place, 462 U.S. 696, 702 (1983). The existence of a reason to believe that the brown bag contained drugs had not been established when Adebanjo withdrew his permission to make a consensual search. Getting off of a train that travelled through New York and misidentifying his place of residence as Phila delphia instead of Maryland may have made Adebanjo less than desirable to the police officer; however, those factors did nothing to create an articulable suspicion that Adebanjo was carrying drugs in his paper bag.
 
 
 27
 The approach taken here by the police and prosecutors would practically eliminate the constitutional protection against unreasonable searches and seizures. As the Supreme Court made clear in Terry v. Ohio, 392 U.S. 1, 12-13 (1968), the prosecution may not, in order to convict, utilize evidence obtained in violation of a person's constitutional rights. I, therefore, dissent, and would hold that the contents of the brown paper bag and the shoebox should be suppressed as evidence.