UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 95-5257

HERBERT ZELLMER,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CR-94-150-JFM)

Argued: June 7, 1996

Decided: August 27, 1996

Before HALL and ERVIN, Circuit Judges, and JACKSON,
United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Beth Mina Farber, Assistant Federal Public Defender,
Greenbelt, Maryland, for Appellant. Harvey Ellis Eisenberg, Assistant
United States Attorney, Baltimore, Maryland, for Appellee. **ON
BRIEF:** James K. Bredar, Federal Public Defender, Greenbelt, Mary-
land, for Appellant. Lynne A. Battaglia, United States Attorney, Balti-
more, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

After his motion to suppress certain evidence was denied, Herbert Zellmer preserved his right to appeal the suppression ruling and then pleaded guilty to a single count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). We find no error in the denial of the suppression motion, and we affirm the judgment of conviction.

I

There is no dispute as to the following historical facts.[1] In the early afternoon of February 7, 1994, Baltimore police officer John Windle received a radio transmission that an anonymous tip had been received about a white male in a black coat and white pants who was armed with a 9 mm. pistol and was carrying three rifles under a sheet on the 1800 block of McHenry Street. Officer Windle spotted the man a few minutes later and approached him; Officer Smith arrived shortly thereafter in another patrol car. Zellmer was carrying "long hard objects" wrapped under a sheet, but Windle could tell that he was not armed with a pistol, and no search of his person was ever conducted.

Upon Windle's request, Zellmer laid the rifles on a stoop. Windle noticed a screwdriver in Zellmer's back pocket, a cut on his hand with dried blood on it, and a tattoo of interlocking skulls across his fore-

_____

[1] In addition to Officer Windle, who provided the bulk of the testimony at the suppression hearing, two other persons testified. Officer Smith said that when he first approached Zellmer, he did so with his gun at his side because of the nature of the call. After about a minute, however, he reholstered it. He stayed about ten feet away the whole time, and he testified that Zellmer was cooperative and was not acting suspiciously. Zellmer's friend, Hunker, testified that Zellmer was wearing a navy peacoat. Zellmer did not testify.

2

head. Windle, a ten-year veteran of the police force, testified that he believed that the tattoo was related to a prison gang.

The rifles were not loaded, though the sheet contained some loose ammunition. Zellmer initially explained that the guns were his and that he was moving them because there had been a fire at his house. After Windle noted that there was no apparent fire damage to the rifles, Zellmer changed his story and said that he had bought them a week after the fire. He could neither give a name or description of the seller nor produce a bill of sale.

Officer Windle decided to check to see if the rifles were stolen. He wrote down the serial numbers and used his radio to call the National Crime Information Center (NCIC). While Windle was waiting for the answer, Zellmer volunteered that he did not need any trouble because he had just been released from prison after serving two years. Zellmer also said that he had received the tattoos in prison, as Windle had suspected. Windle was then informed that the rifles were not listed as having been stolen.

Zellmer became evasive when the officer asked him what he had been in prison for. Windle then called his stationhouse to see if there were any outstanding warrants for Zellmer. The city sergeant said there were not, though he also said that Zellmer had prior felony convictions for robbery and burglary. Up to this point, about ten minutes had elapsed from the initiation of the encounter.

Because it is not a crime to carry unconcealed, unloaded rifles in the street in Maryland, and because Windle did not consider the rifles to have been concealed, he felt that he had no basis for an arrest under state law. However, he believed that federal law might be involved, so he called the Bureau of Alcohol, Tobacco and Firearms, and an agent there told him to seize the rifles. Windle announced that he was keeping the rifles and that Zellmer was free to go or to come to the stationhouse. Zellmer was not arrested that day.

The court denied the motion to suppress on the ground that the entire encounter was justified under Terry v. Ohio, 392 U.S. 1 (1968), or, alternatively, that the encounter was consensual up through the seizure of the rifles. After preserving his right to appeal that ruling,

3

Zellmer pleaded guilty to being an ex-felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Because this conviction was preceded by three other convictions for violent felonies, he received a 180-month sentence under the enhanced sentencing provisions of 18 U.S.C. § 924(e). He now appeals only the suppression ruling.

II

Zellmer contends that he and his rifles were detained throughout all or most of the fifteen-minute encounter and that such detention exceeded the permissible limits of a Terry stop. He argues that he should have been allowed to leave after Officer Windle determined that the rifles were not loaded or, at the very least, after Windle learned that the rifles were not listed on the NCIC computer as stolen. We find that the detention was justified through the seizure of the rifles.[2]

We review de novo the district court's finding that the facts, viewed from the standpoint of an objectively reasonable police officer, amounted to "reasonable suspicion" or probable cause that Zellmer was involved in criminal activity. Ornelas v. United States, 116 S. Ct. 1657 (1996).

The encounter began as a legitimate Terry investigative stop; even Zellmer concedes as much.[3] A tip was received that a particularly described person at a certain spot was carrying a loaded pistol and three rifles under a sheet. Inasmuch as it is a crime to carry loaded or concealed firearms in the city, the officers' decision to temporarily detain Zellmer was "supported at least by a reasonable and articulable suspicion that the person seized [was] engaged in criminal activity." Reid v. Georgia, 448 U.S 438, 440 (1980) (per curiam) (citations omitted). Zellmer argues that once the officers satisfied themselves

_____

[2] We assume, for the purposes of this opinion, that Zellmer was not free to leave, with or without his rifles, at any time during the fifteen-minute encounter. In its memorandum opinion denying Zellmer's motion for reconsideration of the denial of the suppression motion, the district court declined to decide whether Zellmer consented to stop.
[3] See Appellant's opening brief at 12 (The police "were probably justified in asking him to lay down the rifles.") and 13 ("The officer was justified in inspecting the rifles to determine whether they were loaded.").

4

that he had neither loaded rifles nor a concealed pistol, the basis for the stop -- a possible violation of state law-- evaporated, and he should have been given the rifles back and told he was free to leave. We find that a continued Terry stop was justified.

After satisfying themselves that the rifles were not loaded, the officers checked to see if they were stolen. To do this, they had to take down the serial numbers. Zellmer says there was no"reasonable articulable basis" for continuing the seizure after the officers satisfied themselves that he was not armed. In Zellmer's case, however, the police had grounds for further investigation into whether the rifles were stolen.

Although Zellmer was under no legal duty to answer the officers' questions, he did so, but he could not give a straight answer about where he had obtained the guns. First they had been in a fire a week ago, then they had been bought after the fire from a person whom he could neither name nor describe. He had a prison-gang tattoo on his forehead, a possible burglary tool (screwdriver) in his pocket, and dried blood on his hand -- in short, the officers had an objectively reasonable basis for suspecting that Zellmer may have recently stolen the rifles or, in light of his inability to name or even describe the person from whom he had purchased them a week earlier, that he may have obtained rifles that had been stolen previously.

"Reasonable suspicion is a commonsensical proposition," and the practical experience of police officers must be credited. United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Our de novo review must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas, 116 S. Ct. at 1663. The facts known to the officers to this point were adequate grounds for suspecting that the rifles were stolen, and this "reasonable suspicion" permitted further temporary detention of Zellmer while the police "attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." Florida v. Royer, 460 U.S. 491, 502 (1983).

> In assessing whether a detention is too long in duration to be justified as an investigation stop, we consider it appropriate to examine whether the police diligently pursued a

5

means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

United States v. Sharpe, 470 U.S. 675, 686 (1985). A radio call to the NCIC clearly falls within these parameters, and a legitimate Terry stop continued for the few minutes it took to complete the NCIC call. See, e.g., United States v. McFarley , 991 F.2d 1193 (4th Cir.) (Terry-type detention of luggage for 38 minutes to subject it to dog-sniff not unreasonable under circumstances), cert. denied , 510 U.S. 949 (1993).

III

Zellmer's second argument is that the officers had no grounds to detain him or his rifles after ascertaining that the rifles were not listed as having been stolen (of course, if the rifles had just been stolen, it stands to reason that they would not yet have been listed on the police computer). In the short period between the call to the NCIC and the ultimate seizure, Officer Windle made two phone calls because he "believe[d] that there was something about these rifles that wasn't quite right." The first, to his stationhouse, was to find out if there were outstanding warrants for Zellmer and if he had a prior record. The second call was to ATF; when Officer Windle learned that Zellmer's mere possession of the rifles constituted a federal crime, he clearly had probable cause to seize the rifles. But reasonable suspicion turned into probable cause even earlier than this.

While Windle was waiting on the NCIC information, Zellmer volunteered that he had just been released from prison. Thus, during the legitimate Terry detention, probable cause arose to seize the rifles as contraband under the federal firearm laws. That Officer Windle made additional checks -- the phone calls to his desk sergeant and to the ATF agent -- is largely irrelevant.

We use an objective standard to judge the officer's actions. The facts known to him during the Terry stop-- Zellmer was an ex-felon who had three firearms in his possession -- were objectively adequate to justify the seizure. That Windle was not entirely certain of the federal law until the call to the ATF is not determinative of the Fourth

6

Amendment issue. See Royer, 460 U.S. at 507 ("[T]he fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-type rationale would not foreclose the State from justifying Royer's custody by proving probable cause . . . ").

In summary, we hold that the stop of Zellmer was justified at its inception, that reasonable suspicion that he had stolen the rifles existed through the radio call to the NCIC, and that the duration of the stop was reasonable. During this call, when Zellmer volunteered that he had recently been incarcerated in the State prison, probable cause arose that justified the continued detention and the ultimate seizure of the rifles.

AFFIRMED

7