UNITED STATES of America,
Plaintiff–Appellee,

v.

Eric F. SANDERS, Defendant–Appellant.

No. 90–5654.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 11, 1991.

Decided Jan. 21, 1992.

As Amended Feb. 12, 1992.

---

Allen Bethea Burnside, Asst. Federal Public Defender, Columbia, S.C., for defendant-appellant.

David Calhoun Stephens, Asst. U.S. Atty. (E. Bart Daniel, U.S. Atty., on brief), Greenville, S.C., for plaintiff-appellee.

Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.

ERVIN, Chief Judge:

Eric Forward Sanders appeals his conviction for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). He raises three issues on appeal: whether the district court erred in (1) admitting a confession resulting from an allegedly illegal arrest; (2) failing to dismiss because of the government's destruction of potentially exculpatory evidence; and (3) relying on a prior conviction to classify Sanders as a career offender. While the district court did not err on the last two issues, we reverse and remand for a new trial with respect to the first issue.

## I.

Sanders was taken into custody on October 26, 1989. An indictment, returned November 14, 1989, charged him with armed bank robbery. Following the selection of jurors, a suppression hearing was held. The court denied Sanders' suppression motion, and subsequently the jury returned a verdict of guilty.

Sanders was sentenced on April 25, 1990 to imprisonment for 300 months under the United States Sentencing Commission Guidelines, with five years of supervised release to follow. Sanders timely appealed.

## II.

A lone black male robbed a branch of the Security Federal Savings Bank in Greenville, South Carolina, on October 13, 1989. The robber, wearing a white handkerchief as a mask and a hat pulled down low on his head, was holding a gun.

A motorist, Bill Searson, happened to drive by the bank immediately after the robbery. A teller following the robber from the bank flagged Searson down and Searson briefly pursued the bank robber's vehicle as it left the crime scene. Searson told the police that the car was a small gray vehicle with damage on the passenger's side. Searson later identified Sanders' car as being similar to the vehicle he chased.[1]

About ten days later, on October 23, 1989, Detective Terry Christy of the Greenville City Police Department saw a small gray Toyota that resembled the vehicle

---

1. His exact words were "I believe this is the car I saw at the robbery." The car that he viewed was damaged on the driver's side, but he explained the discrepancy by saying that he was looking in his rear view mirror at the time of his initial observation.

that Searson had described. Christy had a uniformed officer stop the car. Christy talked to the driver and determined his identity and correct address. The driver was Eric Forward Sanders, who presented his registration card and driver's license. Christy wrote down the license tag number of the vehicle and later ascertained that Sanders and his wife were the owners of the Toyota. Nothing was said about a bank robbery during the October 23 stop, which lasted five to ten minutes.

On October 26, Christy directed two uniformed officers to stake out Sanders' car and to stop Sanders if he attempted to drive away. Around 9:30 a.m., Sanders, walking with crutches, came out of his apartment and went to the parking lot where his car was parked. He got into his car, started it and backed it up to the other side of the parking lot.[2] After he stopped the car and as he was getting out of his vehicle, the police drove into the parking lot, blocking Sanders in. They asked Sanders about his improper license tags and about his headlights and sticker. Sanders admitted that he had an expired license tag, that his car was uninsured and that he had not paid taxes on it because he did not have the money. Sanders was then arrested without a warrant and handcuffed. There was a dispute as to whether the officers told Sanders why he was being arrested, but no one ever claimed that Sanders drove the car on any public street or highway or left the confines of the parking lot on the day in question.

Later that same morning, Sanders was given *Miranda* warnings by Christy and signed a waiver of rights form. Sanders then confessed to the October 13 bank robbery. Taking the position that no traffic laws were violated to justify the arrest, the defense moved to suppress the confession as the fruit of an illegal arrest.

At the suppression hearing, Christy testified that his entire purpose in instructing the officers to watch the car and arrest Sanders after he got in the car was so Christy could interrogate Sanders at the police station about the bank robbery and other robberies in which he was a suspect. Christy also testified that on October 26 he did not have probable cause to make an arrest on the bank robbery charge. The AUSA also stipulated that Sanders was not arrested for bank robbery; that he was arrested for traffic charges instead.

At the close of the suppression hearing and without making any findings of fact, the district court ruled that Sanders' statement was given freely and voluntarily. When queried about the legality of the arrest, he added: "I overrule the motion. The arrest was legal."

Sander's trial followed and two tellers identified Sanders as the robber. The government also used the challenged confession against Sanders. At trial, the government was unable to present a videotape taken of the robbery in progress. The tape was erased in the process of duplication by a commercial lab. Sanders moved to dismiss the case based upon the government's "destruction" of the evidence. He, however, neither alleged nor demonstrated bad faith on the part of the government in their handling of the tape. The district court did not rule on this motion to dismiss.

At sentencing, two prior offenses, a bank robbery and a murder, were the predicate for the district court's classification of Sanders as a career offender under U.S.S.G. § 4B1.1. It was Sanders' position that these two offenses should have been consolidated since they shared a common motivation, namely, drug addiction.

### III.

#### A.

Sanders first avers that his confession is the consequence of an illegal arrest. Sanders was eventually issued three traffic citations for his actions prior to his arrest on October 23, each of which has a central element that the vehicle was operated on the state's highways. His first ticket,

---

**2.** Sanders explained that he had been receiving traffic tickets telling him to move his car within seven days. He felt that this was the result of the fact that his driver's license showed his old rather than his current address.

#5651, charged him with operating an uninsured vehicle. Section 56–10–270 of the South Carolina Code of Laws Annotated (Law Co-op 1976) makes it a misdemeanor for "any person to knowingly operate an uninsured motor vehicle subject to registration in this state." Section 56–3–110, pertaining to registration, states that "every motor vehicle ... driven, operated or moved *upon a highway* in this state shall be registered...." (emphasis added). With reference to uninsured vehicles, the South Carolina Supreme Court explained in *St. Paul Fire and Marine Insurance Company v. Boykin*, 251 S.C. 236, 161 S.E.2d 818, 821 (1968):

> Liability insurance or its equivalent is not a requirement for ownership of a motor vehicle or for obtaining a certificate of title but is a prerequisite to licensing and registration of the motor vehicle in order to legally operate the same *upon the highway*. (Emphasis added).

The second ticket, #5652, charged Sanders with driving with expired tags in violation of S.C.Code § 56–3–840, which makes it a misdemeanor "to drive, move, or operate *on a highway* any vehicle for which a registration and license are required...." (Emphasis added).

The last ticket, #5653, charged Sanders with possessing a car with an improper vehicle license plate in violation of § 56–3–1360 of the state code. The relevant section of the code states that, "[N]o person shall drive or operate any motor vehicle ... *on a highway* displaying thereon a vehicle license plate which was issued for any other vehicle." (Emphasis added).

██ Each of the three traffic offenses require the operation of a vehicle upon the state's highways. Since the uniformed police officers lacked any evidence that Sanders' car was driven on a public road on the day of his arrest, they lacked probable cause for his arrest. Lacking such cause, the arrest was illegal.

██ In an attempt to salvage its conviction, the government cites § 23–1–15, South Carolina Code of Laws Annotated, which provides:

## PUBLIC PARKING LOTS WITH POLICE JURISDICTION

Any real property which is used as a parking lot and is open to use by the public for motor vehicle traffic shall be within the police jurisdiction with regard to the unlawful operation of motor vehicles in such parking lot. Such parking lots shall be posted with appropriate signs to inform the public that the area is subject to police jurisdiction with regard to unlawful operation of motor vehicles. The extension of police jurisdiction to such areas shall not be effective until the signs are posted. In any such area the law enforcement agency concerned shall have the authority to enforce all laws or ordinances relating to the unlawful operation of motor vehicles which such agency has with regard to public streets and highways immediately adjoining or connecting to the parking area.

There are several problems utilizing § 23–1–15 as justification to arrest Sanders here. First, this section was not relied on in the district court, but was referred to for the first time in the government's brief in this court. Furthermore, there is no evidence in the record to show that the parking lot in question was open to use by the public, that it was or had ever been posted with appropriate signs to inform the public that the area was subject to police jurisdiction, or that the arresting officers believed that the lot was subject to § 23–1–15. The government suggests that Sanders failed to show that the parking lot in question did not conform to the requirements of § 23–1–15, although it is the government who is trying to use it to validate an otherwise illegal arrest. We reject the attempt to use § 23–1–15 on these facts.

Because we hold that Sanders' arrest was unlawful, the next line of inquiry must be whether his confession was a consequence of this arrest or whether it was instead truly voluntary. The district court, because it erroneously held that the arrest was lawful, never reached this question. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that where a confession is pre-

ceded by a Fourth Amendment violation, such as in the case at bar, in determining the voluntariness of the confession the examining court must decide whether it was " 'sufficiently an act of free will to purge the primary taint' [of the illegal arrest]." *Id.* at 602, 95 S.Ct. at 2261 (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The prosecution has the burden of showing admissibility. *Id.*, 422 U.S. at 604, 95 S.Ct. at 2262.

▇ Sanders does not dispute that he was given his *Miranda* warnings, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or that he executed a waiver of rights form. The Court in *Brown* overturned the lower court's decision that the giving of *Miranda* warnings alone removed the taint of the illegal arrest so long as the subsequent confession was voluntary and not coerced. While *Miranda* warnings do constitute a factor to be considered in ascertaining whether a confession is obtained by utilizing an illegal arrest, there are other factors to be examined, including the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct. We are particularly concerned about the trial court's failure to examine the purpose and flagrancy of the official misconduct. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (seizing petitioner without probable cause and transporting him to police station for interrogation violates Fourth and Fourteenth Amendments).

Since the district court erroneously determined that Sanders' arrest was legal, the court had no occasion to apply the teachings of *Brown* and its progeny to the facts of this case. Consequently, the question of whether Sanders' confession is or is not admissible has never been properly addressed. This issue is so fact-laden that the case must be remanded to the district court to enable that court to conduct, if necessary, a new suppression hearing, at which it must make factual findings and conclusions on the key issue of whether

Sanders' confession was " 'sufficiently an act of free will to purge the primary taint' [of the illegal arrest]." See *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). We therefore reverse the district court's ruling on the suppression motion and remand the case for a new trial in accordance with this opinion. We intimate no views as to the applicability, if any, of § 23–1–15 to this case.

### B.

▇ Sanders next contends that the district court erred by not granting his motion to dismiss based upon the erasure of the bank videotape. Sanders, however, makes no claim of bad faith by the government. Indeed, he would not be able to credibly do so. The tape was delivered to the Federal Bureau of Investigation on the day of the robbery. It was subsequently turned over to a commercial firm for development. The company had handled tape processing for fifteen years for the F.B.I. and this was the first time that a tape was destroyed.

*Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. at 337. Given the absence of bad faith, and considering the circumstances of this particular erasure, the district court did not err in refusing to dismiss this case on that ground.

### C.

▇ In the early seventies, Sanders was convicted of armed bank robbery and the murder of a jewelry store owner during the commission of a different robbery. Sanders argues that because these two crimes shared the same motivation, namely, to sustain his addiction to heroin, they should have been consolidated by the district court for the purpose of determining whether he was a career offender under the Sentencing Guidelines. The Guidelines categorize

**232**

a defendant as a career offender if he has two prior felony convictions for crimes of violence or controlled substance offenses. U.S.S.G. § 4B1.1. Sanders' argument, while novel, is without merit. Shared motivation cannot transform two crimes committed three months apart, prosecuted in different jurisdictions, and involving different victims, into one illicit act. The district court properly classified Sanders as a career offender.

### IV.

For the aforestated reasons, the conviction is reversed and the case is remanded to the district court for a new trial in accordance with this opinion.

REVERSED AND REMANDED.